Thank you, Your Honor. May it please the Court, my name is Colin Feynman, and I represent Appellate David Tippens. I'd like to reserve five minutes for rebuttal. Okay, the count's down. We'll try to help you keep track. Thank you, Your Honor. In the heat of argument, I may not track the clock, but I would like to start out by reminding the Court of the foundation upon which this entire case and all of our issues is built. In Terry v. Ohio, the Court said that admitting evidence has the necessary effect of legitimizing the conduct which produced the evidence. And in this case, Judge Bryan found below, at excerpt of Record 63, that the government's conduct cannot be powers, and of course, this Court's supervisory powers. He made a series of unprecedented findings that amount to findings of criminal conduct by the Department of Justice and FBI. And I just want to give you one example that truly, in my estimation, and not merely for effect or advocacy, shocked my conscience, which is the fact that among all the other grand science experiment, the specific finding by Judge Bryan at page 40 to 41 of the record, that the FBI abetted the posting of 44 new series of child rape and abuse. I'm sorry, say that one more time. That the FBI uploaded and distributed, through their management of the Playpen site, 44 new series. These are series that had never been distributed or posted before, were directed to Playpen specifically for the first time, 44 new series of child rape and abuse. And they did not even take the minimal step, minimal step, of blocking those new series from redistribution to 120 countries, over a million images at a minimum distributed by the FBI. How is this different from an undercover police officer, male or female, dressed up as an FBI agent, and wandering around a high crime area, looking for johns? Your Honor, the difference is that, first of all, you're not going to complete a crime in terms of having an enticement there, okay? And here, there's no question that the distribution Let's say it's a female agent, and she's quite attractive and scantily dressed and overly made up in a way to attract men who might want to engage in sex for hire. Your Honor, the idea of having a honeypot type of scam is that you may put out something like a facsimile of this site. It's not disputed, for example, that the FBI could have spoofed this site, or blocked the most egregious images for distribution, or simply not allowed even those 44 new series of child rape to be distributed. It's different to have something that is a decoy, or even a controlled delivery of narcotics, which I think might even be a closer example, where you put out some contraband, but you immediately retrieve it and do not allow it to circulate in the committee. I mean, in this case, Judge Bryan found that the government had re-victimized hundreds of children. So if you're taking the prostitution example, it's not simply a matter of putting an officer out there as a decoy. It's standing by and watching prostitutes get raped as the idea, well, we're going to scoop up a lot of johns in terms of this process. At the end, somehow justify these criminal means. And we have to also understand that Congress spoke specifically to law enforcement in 28 U.S.C. 3509M, where it said that the government cannot redistribute child pornography for any reason. Congress has spoken on this in terms of it being a different crime than even those where contraband is used in a controlled delivery. I don't mean to minimize what the government did here, but I'm going to follow along Judge Hawkins' line of question to try to figure out how it's different from other instances where the government might be involved in some form or another with criminal activity, maybe even facilitating it and so on. We get some drug cases where we don't nearly have controlled buys, where immediately after the buy, there's an arrest. There's a fair number of cases where we have, through confidential informers or otherwise, engaging in drug transactions as they sort of build the record, figure out who the bad guys are. How's this different? Correct. The two things are, I think in all those circumstances, they still attempt to control the delivery or recoup the contraband. Certainly they may. I'm not sure that's always so, particularly if you've got confidential informants. All right. Then let me put it, address it directly in two other ways. One, as I indicated, Congress has already spoken about child pornography being different and has precluded the government for doing this. And of course, the government says child pornography is different because of the re-victimization that occurs every time you may look at this. In addition, Your Honor, I would say that even in the CI situation, there's every effort made to at least contain and recoup the drugs at some point. In this case, Agent Alf and the lead agent, whose misrepresentations permeate this record, did testify that there were absolutely no protocols whatsoever for the handling of child pornography. Let's assume that we agree. I mean, Judge Bryan found this to be outrageous conduct, but nonetheless didn't hold the warrant in the evidence he is pursuant that weren't invalid. So let's assume we agree with you that it's outrageous conduct. How does Judge Bryan get to where he does while finding it outrageous? I don't know, Your Honor. I would have thought with those factual findings, the fact that he determined the conduct could be not condoned, that the ends did not justify the means. I have to tell you, when I read those findings, I was baffled by the collusion. He did not take the final step. But I believe the facts and law are on our side in terms of both those findings, which are undisputed by the government. Is it legally permissible for the district judge to find outrageous conduct, but nonetheless not to eliminate the evidence subtained pursuant to the warrant? I would frame it this way, Your Honor. I think Judge Bryan had an obligation to exercise his supervisory powers based on those findings. He did not. I believe there is a law — My question was a little different. I'm sorry. I misunderstood it. Is it legally impermissible, once a district judge has found impermissible — found outrageous conduct — No, Your Honor. — to allow the evidence nonetheless to come in? No, Your Honor. In fact, he has discretion on that. That is the standard on that. Well, it applies to black factors, making that determination. The black factor — What do I do now that I find it outrageous conduct? Our primary argument is not based on black, even though that is a totality of the circumstances test. And, of course, we see the undisputed circumstances. I think our stronger argument and the one that was not even addressed below in the actual order was the supervisory powers argument, in which this Court has clearly said that either constitutional or illegal conduct needs to be sanctioned. Supervisory powers in black are two different ways of analyzing this — Which is an extreme remedy. I think this is an extreme case, Your Honor. I do. Do you know of any case since black where there's been a dismissal under supervisory powers for outrageous government conduct? Any case? You know, the closest case that we have to this, Your Honor, was, of course, the Sherman case, where the government was warned about this. But the issue had not been raised there. It was raised to us by the Court. So the short answer is no. Well, in this case, clearly, the government conduct was, at the very least, offensive, if not outrageous. But a number of courts found that the use of this network by the FBI for a limited period of time wasn't even outrageous. Well, our case is different, Your Honor, because this is the only case in which the discovery orders, for example, at Record 69, were implemented by the judge below. We had none of these facts about the level of distribution, the 44 new series B postings. None of those facts were available to any of the other defendants because we are unique in terms of the discovery that we received. Let's go at it a different way. The FBI, their motivation was that they had to use this network to identify users and viewers and criminals. But that's not true, Your Honor. They, well, isn't that why they ran the system, is to identify who was using it? No, Your Honor. What was happening here is that they had, it's undisputed, they had alternative ways of doing that. For example, they already had, for at least a thousand users, all of the identifying information on the set, on the site. The idea was to, because the identity is hidden, they had to use this network to identify certain users. For at least a thousand of them, their identity was not hidden, Your Honor. All right. But my notion is, if they couldn't otherwise identify users and victims, would it be outrageous for the government to do nothing? If that were the case, but that's not this case, because the government has not disputed that they had alternative methods here, Your Honor. To discover all of them? I understand you said they already knew or had means to discover some. To discover all of them. Well, there are 150,000 users, no, but they've charged about 230, and they had over a thousand to begin with. So I guess that may be part of the equation, Your Honor. I can't dispute that. But my point, I suppose, is can the government use patently illegal means to generate surplus targets that are not even ultimately charged? Your Honor, I only have five minutes left. I'd like to reserve the balance, because I did want to get to the NIT warrant itself. Thank you. Okay. Your Honor, unless you have another question, I'm going to cut you off. No, no. Good morning, Your Honors, and may it please the Court. Mr. Tippin's characterization Could you identify yourself for the record? Teal Miller, on behalf of the United States. I apologize. Mr. Tippin's characterization of the operation here ignores two very important facts and misstates a couple of others. One is the government went to a district court judge and got authorization under Title III to take over the server, and it set out District judges make mistakes sometimes. They do make mistakes, but it set out exactly what it planned to do here and the necessity. It made the showing necessary to get a Title III warrant. I'm not aware of any outrageous government conduct case. I mean, there are very few cases in which a court has held that something should be dismissed for that reason, but even with that said, very few cases in which law enforcement was acting pursuant to an order from a district court. We also had the magistrate judge's order here, too. There's also several misstatements of the record here. At page 861 of the record, you can see where this supposed we distributed 44 new series comes from. In fact, what this says is once this operation was over, we sent a large number of images beginning from September of 2014, so not during the period when we were operating the website, through the end, and there were 44 new series during that total period. There was no effort to break down what new series were posted onto the website while we operated it. It is also wrong to characterize this as distribution. We took over an already operating site, and the... If you took over, or if the government took over an operating site and for a two-week period operated it, it's, I think, kind of quibbling to say that you didn't distribute it. The site that the government was operating was facilitating the distribution. Is that right? That's right. It was a bulletin board. It's not like we were condoning the creation of new images and disseminating them, and I think that the characterization of what we did that way is just flatly inconsistent with the record. Well, I think we understand what happened. That is to say, they were running a site that made this possible. That is right, and the operation, if you look at pages eight and nine of our brief, resulted in the rescue of children from hands-on abusers. The government is entitled, as a law enforcement judgment, to weigh the harm, the real harm, that we take seriously of re-victimizing children by having their images continue to be posted versus the harm of having children who are being victimized by hands-on abusers and decide that this unique opportunity where we were able to find this website operating on the dark web and take it over for two weeks in order to identify people using it. I also want to take issue with the 1,000 ISP addresses. That's wrong. If you look at page 944 of the record, you'll see, which is what Mr. Tippin cites for the proposition that we already had 1,000 ISP addresses, you'll see that that's their estimate based on the ISPs became available to us through Quirk. And he's saying, well, less than 1% of 100,000 is 1,000, but it's about 1,000. But there's nothing in the record that supports the idea that we could have prosecuted 1,000 people even without this operation. But the presence of the website and the images available on the website gave the opportunity for pedophiles to download those images, and if they wanted to, to distribute them to other people, correct? That is right, Your Honor. And that was made clear both to the district court judge who blessed the Title III warrant and the magistrate judge who approved the NIT warrant. So this was an operation that was done with the approval of two courts. And the idea that it was outrageous and that all the courts that have considered it since then have... Well, all the courts but one. All the courts but one. You know, I recognize the district court used the word outrageous, but he also did not make a legal conclusion of outrageous government conduct. So, you know, as a personal matter, he found it outrageous. I agree with that. Well, it's hard for me to sort out, if he says it's outrageous, for me to decide, well, you know, he didn't mean it. Well, I'm not saying he didn't mean it. I'm saying he made an observation. He made a conclusion that it was outrageous. But he did not make a legal judgment that it constituted... You know, I think you're cutting it too fine and you don't need to in order to win the case. Judge Bryan is sitting as a judge and he calls it outrageous and he knows that there's a legal standard called outrageous. I have trouble concluding that he didn't mean it in a legal sense. Fair enough, Your Honor. As you say, we don't need you to reverse that or to not treat it as a finding in order to win this case. I think in Inclinized, the Seventh Circuit's decision where they say, we don't recognize this defense, but if we did, you couldn't have it here. They make the observation that it's a little bit outrageous for a defendant who's regularly accessing a child pornography website to argue that the conduct here was so outrageous that he should get the benefit of it. And I think that instinct is a correct one. Again, that's absolutely standard in the sense that the outrageous conduct argument is raised by people who have themselves engaged in reprehensible conduct. I mean, that's just the nature of the business. But they're raising outrageousness that was directed at them. And here, the outrageousness — I understand that, too, but that's not the point you were just making. You were saying it's ironic or maybe even for some reason we should reject it because the person raising the outrageous conduct argument against the government himself or herself was engaged in reprehensible or outrageous conduct. But that's just the way these cases arise. Whether it's directed at them is a different question. Well, but it is a component of this Court's review of the exercise of supra-powers and certainly of the due process power. Whether the government's actions had a flavor of entrapment, whether they were directed at the defendant, whether they enticed a crime, whether they encouraged a crime. Here, no one who visited this website did so as a result of anything the government did. Right. No, I understand that. Correct. There's, in scouring the record this morning, I came across an affidavit from an expert for the FPD, I think in San Diego, who said that sometimes individuals' computers can be hacked and, for lack of a better expression, this kind of material forced on their own never expressed interest in this sort of material. How did the government respond to that? Well, Your Honor, Judge Bryan dismissed two of the charges here after concluding that the discovery we gave made it impossible for him to refute or to show whether to establish that that hadn't happened. So that's not at issue here. So those counts are gone? Yes. Yes, they are. I'd be happy to address any other component of the government's case that, excuse me, the defendant's case that remains after Henderson. I think Henderson's understanding of the Eastern District of Virginia NIT warrant makes clear that it considered that warrant to authorize searches outside of the Eastern District of Virginia. I think it's logically possible to read it as a question that wasn't presented to the Court and, therefore, the Court didn't consider. But when you read what the Court said and how it read the warrant, it read the activating computer's language from Attachment A of the warrant as authorizing the search that happened. And the Henderson court's good-faith analysis applies both to that argument and also to Mr. Tippin's argument that there was no probable cause stated in the Eastern District of Virginia warrant. I'd be happy to address that or to address the Washington warrant. Well, I'd like to hear from you on the Washington warrant, and — Yeah, please. Please. Go ahead. Well, the Washington warrant stated probable cause to believe that there would be child pornography or evidence of viewing child pornography on Mr. Tippin's warrant. It stated a fair probability that that would be there based on the 26 hours he spent on playpen. And the agent's experience, which showed that individuals who persistently seek out child pornography are likely to have either child pornography or trace evidence that they have accessed it on their computers. And the approach here is very similar to the Gourd case and the Shesso case, which said even individuals — Shesso in particular — even an individual who was security-minded in that case, he, 18 months before, had uploaded an 18-minute child pornography video to a peer-to-peer site. And the opinion takes pains to say he only did it — he only made it available for four hours. So he, like Mr. Tippin's, was a security-minded individual. And yet, this Court had no problem saying that the agent's experience with people who persistently seek out child pornography, showing that it is likely that there would be evidence of their having done so in their homes, was a stated probable cause. What I had in mind in particular was the judge's concern with the agent's affidavit and the so-called misstatements in that affidavit. It seemed like the trial judge was very impressed with the credibility of that witness, right? There's no question he made a positive credibility finding as to a detective's shook. Well, because in the affidavit, he asserts that the depictions were downloaded when they weren't. He changed that to they were viewed. His testimony — Go ahead. His testimony makes clear that he was using the word download and view interchangeably, and the Court accepted that testimony as credible. And in fact, a computer does download, at least temporarily, an image when you view it from a different site. And the difference with a Tor browser is what your computer does with it when you're looking at it. Yeah, it seems like maybe that agent used a — like a formatted application affidavit that picked up language of other pornograph cases, pornography cases. Well, it is true that there is a component of the affidavit that he agreed had been — you know, was a description of people who collect child pornography and how computers work. But there is also a component of the affidavit that describes the fact that Playpen was a hidden site, and so all of his security-mindedness was made apparent to the magistrate judge who granted this warrant. And in light of the credibility findings here, this Court would have to reverse the District Court's credibility finding in order to conclude that this warrant didn't state probable cause. What do you do with the argument that the bill of lading does not show that the computer was transported? Detective Shook testified that he believed that it was transported by hand and that the fact that there was also things in the bill of lading that indicated he had a computer, including two printers, meant that it didn't give him pause. And the District Court judge found that plausible. And was it, in fact, found on a laptop, or was it on a — It was on a laptop. If you look at page, I think, 263 of the record, you see our expert declaration, which shows that he had a laptop. And at the end of that declaration actually says that when we examined that laptop, there was evidence, there was a URL for Playpen on that laptop. Did he use a laptop as well in Hawaii? It was, I believe, the same laptop. But we just had to show a fair probability that it would be, and we did so. And the argument was that particularly if you have a laptop, that's likely to be carried by hand rather than given off to the movers to put into the — all the household goods. I don't believe that the agent testified to that or that we knew it was a laptop before we did the search. But the agent said in his experience with moving, and particularly having been the child of a military family, he thought it was common for people who are in the military to have items that they might want quickly or that they found valuable to move them themselves. You used the phrase, before we did the search, before the search was done, correct? Yes, Your Honor. I remember when I came into the U.S. Attorney's Office, the assistants wanted to have badges. And I said, we're not cops. Thank you, Your Honor. I'll try to be more precise. If the Court has no further questions, we ask that the judgment be affirmed. Okay. Thank you. Thank you. Mr. — is it Feiman? Thank you, Your Honor. I want to go directly to the Washington warrant because that is unique to this case, and I to reversal. Detective Shook was a remarkable, credible witness because he forthrightedly admitted during the testimony all of the deficiencies that were in the warrant. I'm quoting from 182 of the record, and this is Shook, the common characteristics set forth in the collector profile do not address Candy Girl — that was the target — in Hawaii in any way. He testified that it was, quote, boilerplate and temp plate, and that's at 215 to 16. And at 182, there was no evidence of collecting either at the time of the warrant application or presented in the warrant. He also — the difference here between Gord is that we have a one-year delay between the Internet activity and 2,600-mile move, and the question is a nexus. The facts must show, according to his court in Grant, that the property to be seized was known to be at the place to be searched as recently as the warrant application to justify belief it's there. The government does not dispute that the only potential basis for nexus, because Detective Shook also testified there was no continuing pattern of contact, no recent Internet activity, nothing in the warrant to show the presence of the computer at the house. He didn't even allege that there was an Internet connection there. The only bases are the false long-term storage claims and the false and misleading boilerplate collector profile, which Shook both admitted he knew was insufficient at the time. He also stated that he knew that there was no long-term storage or cache storage, for example, as we saw in ROM, because of the Tor disavoidance features, the unique features that attend to these type of dark websites. Dark websites, by the way, which the judges have been encouraged to use by the Department of Justice just because for those very security features. So there's no dispute about those two things, that the claim that there would be images found a year later, the potential for that, that was false, that was not true, and that the collector profile was exactly what Weber said is inappropriate. It was misleading, it was foundationalist, and in fact, it was contrary to other statements, as we pointed out, about the security consciousness of Tor users that the government had alleged in terms of the delayed notice applications. So, Your Honor, you know, if we look at this Court's precedence in terms of grant, what's required to establish a nexus, the extraordinary lapse in time and distance between the alleged playpen activity, and by the way, no playpen pictures were ever what Shook knew at the time, and he further admitted that he did know about the disavoidance features at the time of the Warren application, as did yet again lead to Agent Alfin, with whom Detective Shook consulted and received that boilerplate collector profile. When you say no playpen images were found, were there traces from which one could determine that playpen images had been viewed on that computer? What you're talking about is the possibility of trace evidence, for example, website names. That's exactly what I'm asking. Again, no dispute that there would have been no trace evidence found because that is only stored in short-term memory. The government's own expert, Agent Powers, at 236 to 66, stated that once the computer is turned off, that information disappears. Of course, we know he made a long move. So there's no dispute that the trace evidence would not have been there. So the images that were then the subject of the indictment were obtained and downloaded by some other mechanism than through... They just came from other sites at other times, and in fact, there were only five or six images that were alleged in the indictment, and those had nothing to do with playpen. No playpen images consistent with what everybody knew, and Detective Shook forthrightly admitted during his testimony to be true at the time, none of that stuff would be found on the computer. This is undisputed, Your Honor. And if that is a classic nexus disjunction that has nothing to do even with all these other hotly contested issues, it's a simple failure of the Warren application, and unfortunately very misleading statements by the Detective Shook in terms of the potential of finding images in long-term storage based on the evidence that was presented there. Well, the issuing judge was given information by Shook that this individual used a computer in Hawaii using playpen and downloaded child pornography on his computer. Well, actually, it's a little bit different. Isn't that probable cause? Well, one interesting fact is he admitted that it was either him or his mother, so he already had a 50-50 chance. Admit it or contend it? No, he said he had no dispute with that. He said, and in fact, it's in the Warren application. Well, that's simply... He was no longer living in Washington. Well, that's simply because he was living with his mother and two minor children. I mean... Your Honor, what we have here is we have a situation we need to show that it's not simply a matter of probable cause to believe that criminal activity occurred. It's probable cause to believe that the evidence of that activity will be found at the time and location alleged in the warrant. That's the nexus problem. I think you have probable cause that somebody at the White House was going to an illicit site. We're not contending that's the issue. We're contending is that they failed to establish the requisite nexus given the spatial and I really do credit Detective Shook for testifying so forthrightly below. He admitted his errors, he admitted what he knew at the time, and I don't know how to put it more clearly than he did itself when he says that the profile bears no relationship to Candy Girl. I mean, when you have such powerful testimony of a boilerplate collector's profile and false and misleading testimony about the ability to find the alleged evidence at all, there's nothing left. Well, all right. So there's problems with the affidavit. The warrant issues, does a good faith exception apply? It does not, Your Honor, because first of all, in Weber, the court has indicated, has turns upon a boilerplate, or in this case, in fact, affirmatively misleading collected profile, you can't allege the good faith exception because unless there's other aspects which establish probable cause in a nexus, but that's not true here except for the other material falsehood which had to do with long-term storage. It's a Franks issue, Your Honor. There's no, what that comes, there's simply no good faith. If we find a Franks violation here, it automatically vitiates any good faith claim, and that's why we are in a unique position where the affiant himself has established through his testimony knowledge of the true facts and has admitted that the information presented in his application was either boilerplate or false, and it is an extraordinary situation to be in. My red light is blinking, Your Honor. I apologize. I just noticed it, and I hope I addressed your question, Your Honor. Any further questions from the bench? No, thank you.  Thank you, Your Honor. Thank you very much. Thank both sides for their helpful arguments. The United States v. Tippins, submitted.
judges: Hawkins, W. Fletcher, Bury